UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

Joseph Van Loon; Tyler Almeida;
Alexander Fisher; Preston Van Loon;
Kevin Vitale; and Nate Welch,

               Plaintiffs,

        - against -

Department of the Treasury;
Office of Foreign Assets Control; Janet Yellen,
in her official capacity as Secretary of the Treasury; and
Andrea M. Gacki, in her official capacity as
Director of the Office of Foreign Assets Control,

               Defendants.

No. 1:23-cv-312-RP

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION
FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE
TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

CHARLES LEWIS AINSWORTH
  (Texas Bar #00783521)
PARKER, BUNT & AINSWORTH, P.C
  *100 East Ferguson, Suite 418*
  *Tyler, TX 75702*
  *(903) 531-3535 (telephone)*
  *charley@pbatyler.com*

KANNON K. SHANMUGAM*
BRIAN M. LIPSHUTZ*
MATTEO GODI*
JENNIFER K. CORCORAN*
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
  *2001 K Street, N.W.*
  *Washington, DC 20006*
  *(202) 223-7300 (telephone)*
  *kshanmugam@paulweiss.com*

*\* Admitted pro hac vice*

*Attorneys for Plaintiffs*
  *Joseph Van Loon, Tyler Almeida,*
  *Alexander Fisher, Preston Van Loon,*
  *Kevin Vitale, and Nate Welch*

## TABLE OF CONTENTS

Page

Argument ................................................................................................................3

I.    The designation of Tornado Cash is contrary to law and exceeds the Department's
      statutory authority ......................................................................................3

      A.    Tornado Cash is not a foreign 'national' ..............................................3

      B.    The immutable smart contracts are not 'property'...............................8

      C.    The purported Tornado Cash person does not have an 'interest' in property
            in the immutable smart contracts .....................................................12

II.   The Department's action violates the Free Speech Clause of the First Amendment.........12

      A.    The Department's action is not narrowly tailored to address a compelling
            interest............................................................................................17

      B.    The Department's action is unconstitutionally overbroad ...................19

Conclusion .............................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*Altman* v. *City of High Point*, 330 F.3d 194 (4th Cir. 2003) ..........................................10

*Benjamin* v. *Town of Islip*, Civ. No. 20-56,
   2021 WL 8344132 (E.D.N.Y. Aug. 12, 2021)..........................................................10

*Chicago Area Military Project* v. *City of Chicago*, 508 F.2d 921 (7th Cir. 1975)........................18

*Commissioner* v. *Covington*, 120 F.2d 768 (5th Cir. 1941)..................................................9

*Forrest General Hospital* v. *Azar*, 926 F.3d 221 (5th Cir. 2019)....................................8

*Freedom From Religion Foundation* v. *Abbott*, 955 F.3d 417 (5th Cir. 2020) ............................18

*Global Relief Foundation, Inc.* v. *O'Neill*, 315 F.3d 748 (7th Cir. 2002) ....................................14

*Hobbs* v. *Hawkins*, 968 F.2d 471 (5th Cir. 1992) ....................................................18

*Holy Land Foundation for Relief & Development* v. *Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003)..............................................................14

*Johnson* v. *BOKF National Association*, 15 F.4th 356 (5th Cir. 2021)..................................6

*Lynch* v. *United States*, 292 U.S. 571 (1934)..................................................9

*Meyer* v. *United States*, 364 U.S. 410 (1960) ....................................................9

*Miresles-Zuniga* v. *Holder*, 743 F.3d 110 (5th Cir. 2014)..............................................8

*Rollins* v. *Home Depot USA*, 8 F.4th 393 (5th Cir. 2021) ..............................................17

*Schneider* v. *New Jersey*, 308 U.S. 147 (1939) ....................................................18

*Securities and Exchange Commission* v. *Chenery Corp.*, 318 U.S. 80 (1943)..............................5

*Streber* v. *Hunter*, 221 F.3d 701 (5th Cir. 2000) ....................................................9

*United States* v. *Koutsostamatis*, 956 F.3d 301 (5th Cir. 2020) ..........................................9

*United States* v. *Williams*, 553 U.S. 285 (2008) ....................................................19

## CONSTITUTION, STATUTE, AND RULE

U.S. Const. Amend. I....................................................................1, 2, 17

50 U.S.C. § 1702(a)(1)(B) ....................................................................3, 8

Page

Rule—continued:

31 C.F.R. § 578.314 ..............................................................................................9

**OTHER AUTHORITIES**

*Black's Law Dictionary* (11th ed. 2019) ...............................................................10, 13

William Blackstone, *Commentaries on the Laws of England* (1772) ...........................................10

This case is not about carving out special rules for new technology.  It is about holding the United States Department of the Treasury to the basic requirements of the International Emergency Economic Powers Act (IEEPA) and the Free Speech Clause of the First Amendment to the United States Constitution.  In a novel action, the Department has sought to deprive thousands of law-abiding Americans access to an important protocol, known as Tornado Cash, that they used to protect their privacy when making entirely lawful purchases, donations, and other transactions.  Plaintiffs ask only that the Department identify "property" in which a foreign "national" has an "interest," as IEEPA mandates.  The Department has failed to carry its burden on each of those three requirements, and even if it had, the designation of Tornado Cash would violate the First Amendment.

*First*, the Department has failed to show that Tornado Cash is a foreign "national."  The Department has only one theory on that issue:  Tornado Cash is an unincorporated association because it is a body of persons who have combined to execute a common purpose.  The problem is the Department actually defined "Tornado Cash" to include *anyone* who holds a digital TORN token, whether or not they have combined for any common purpose.  That is not an unincorporated association under the Department's own test.  The oddity of that definition is underscored by the Department's unprecedented step of explicitly excluding from the designation the very individuals that it says create the "organizational structure" of that association.  For either reason, the Department has not designated a "national" at all.

*Second*, the Department has failed to explain how the immutable, open-source smart contracts listed in the designation—which no one can own or control—are sanctionable "property."  The plain meaning of "property" is something that can be owned.  The Department points to no ambiguity in the statute, but nonetheless cites its own regulatory definition of "property" to avoid

the statute's plain meaning. Yet all of the examples of property in that definition are also things that are capable of being owned. In the end, the Department cannot point to anything in the administrative record showing that immutable, open-source code is capable of being owned. No limit could be more basic for a statute about blocking property than that the Department must identify property.

*Third*, even if the immutable smart contracts were somehow property, the Department has not shown that the purported Tornado Cash entity has an "interest" in them. The parties agree that the "interest" required by IEEPA must be a legal, equitable, or beneficial interest in property. But in seeking to find such an interest, the Department relies only on allegations that the purported Tornado Cash entity has interests in something other than the immutable smart contracts or would tend to profit from increased use of the immutable smart contracts. Neither one is an "interest" in property in the immutable smart contracts, as IEEPA requires.

*Fourth*, even if the Department had statutory authority to issue its designation, the designation would violate the First Amendment. The Department's constitutional arguments amount to little more than saying that Plaintiffs are free to engage in speech somewhere else. But the First Amendment does not permit such a cavalier treatment of speech. The designation is unconstitutional both because the designation is not narrowly tailored and because it is overbroad.

Those problems stem from the fact that the Department has sought to use a property sanctions statute to regulate the use of software on the Internet—not because of some "clever features" of Tornado Cash, which in any event were adopted for important privacy, security, and consumer-protection reasons. To hold the Department to the basic requirements of IEEPA and the First Amendment would not prevent it from sanctioning the terrorist and cybercriminal groups mentioned in the Department's brief. All it would do is require the Department to identify an actual

foreign national and actual property in which that foreign national has an actual property interest. That is not a loophole; it is precisely what IEEPA commands. The Court should grant Plaintiffs' motion for summary judgment on Counts 1 and 2; deny the Department's cross-motion for summary judgment; and set aside the designation of Tornado Cash.

## ARGUMENT

I.  **THE DESIGNATION OF TORNADO CASH IS CONTRARY TO LAW AND EXCEEDS THE DEPARTMENT'S STATUTORY AUTHORITY**

A.  **Tornado Cash Is Not A Foreign 'National'**

The Department's designation of Tornado Cash exceeds the scope of its authority under IEEPA because Tornado Cash is not a "foreign country or a national thereof." 50 U.S.C. § 1702(a)(1)(B). As defined in the designation, the purported Tornado Cash entity does not meet that requirement. Plaintiffs are thus entitled to summary judgment on Count 1 of their Amended Complaint.

1.  A "national" can be a natural person, corporation, or unincorporated association. *See* Pls.' Mot. 13. Because the Department concedes that its designation was not directed at a natural person or a corporation, its argument relies on showing that Tornado Cash is an unincorporated association. *See* Cross-Mot. 21, 23-26.[1] On that score, the Department agrees that the Tornado Cash "entity" is an unincorporated association only if it is "a voluntary group of persons . . . formed by mutual consent for the purpose of promoting a common objective," Pls.' Mot. 14 (citation omitted)—or, as the Department puts it, a "body of persons who have combined to

---

[1] The Department suggests that Plaintiffs are "incorrect[]" to "focus on whether Tornado Cash is a foreign 'national' under IEEPA." Cross-Mot. 19 n.6. But that is what the language of the statute requires. The Department must identify "property in which any foreign . . . national . . . has any interest." 50 U.S.C. § 1702(a)(1)(B). Nonetheless, the plain meaning of "national" is a "person who resides in a particular country," which in turn includes a "human, corporation, organization, partnership, association, or other entity deemed or construed to be governed by a particular law." Pls.' Mot. 13.

execute a common purpose," Cross-Mot. 21 (citation omitted). But the Tornado Cash "entity" as defined in the designation cannot meet that test.

Before this Court, the Department characterizes Tornado Cash as "a group of individuals who are organized to act in concert, in service of operating, promoting, and updating their mixing service for anonymous digital currency transactions." Cross-Mot. 2. But that characterization of Tornado Cash has almost no relationship to the Tornado Cash "entity" that the Department actually defined in the designation: anyone who merely possesses one of the 1.5 million outstanding TORN tokens. *See* Pls.' Mot. 10; A.R. 32, 35, 333. There is nothing in the record to suggest that those token-holders have combined to execute the supposed "common purpose" of operating, promoting, or updating the Tornado Cash privacy protocol. As the Department itself seems to concede, people hold TORN for any number of reasons, including as a purely passive investment. *See* Cross-Mot. 11; A.R. 38; *see also* Paradigm Br. 9. Holding TORN does not require using the Tornado Cash protocol or supporting its development in any way. *See* A.R. 515, 2212; Defs.' Cross-Mot. 8. Indeed, TORN can even be sent and received without a recipient's knowledge and consent. So the fact that someone does hold TORN proves nothing about whether they have "combined" with a "body of persons . . . to execute a common purpose." Defs.' Cross-Mot. 21.

Attempting to avoid those unhelpful facts, the Department claims without citation that it is only a "narrow subset of TORN token holders" who have "not necessarily agreed to participate in Tornado Cash governance." Cross-Mot. 23. But there is no basis in the administrative record to support that suggestion. It is undisputed that most TORN holders do not participate in Tornado Cash governance. *See* A.R. 40 (observing that a "quorum" for a vote requires just 25,000 TORN tokens); A.R. 2212 (observing that a recent proposal passed by a vote of only twelve participants,

holding just 51,000 TORN tokens).  That highlights the basic disconnect between the unincorpo-rated association test that the Department now accepts and the Tornado Cash "entity" that the Department actually defined and designated.  At its core, merely possessing TORN demonstrates nothing about the holder's purpose.

The Department misses the mark by arguing that the designated Tornado Cash "entity" must exist as a "functional entity" because *someone* has placed job advertisements and set up a fund to reward developers using the name "Tornado Cash."  *See* Cross-Mot. 22.  At most, that evidence suggests there might be some smaller group of individuals that the Department could have designated in their individual capacities or as a smaller unincorporated association.  *See* Pls.' Mot. 15-16.  It does not prove the existence of an unincorporated association consisting of anyone who owns one of the 1.5 million TORN tokens in circulation.  And, under basic principles of administrative law, the Department must defend the designation it made, not some alternative des-ignation it perhaps could have made.  *See Securities and Exchange Commission* v. *Chenery Corp.*, 318 U.S. 80, 95 (1943).

Unable to satisfy the test for an unincorporated association, the Department next attempts to borrow concepts from the law of formally incorporated entities.  For example, the Department correctly notes that "a corporation is still an entity even if many stockholders never intend to vote at a shareholder meeting."  Cross-Mot. 23.  But a corporation is an "entity" because it has satisfied the various formalities required to register as a corporation—something the Department admits is not true in the case of Tornado Cash.  *Id*.  The law of corporations has nothing to say about people who have not complied with those formalities, other than to say that they are not corporations.  For much the same reason, the Department's observation that the "bifurcated structure" of a "core developer group, supported by a DAO," "mimics common corporate structures," Cross-Mot. 22,

comes no closer to identifying an unincorporated association.  Casual resemblances to corporate power structures do not substitute for the common purpose by a defined group necessary to establish an *unincorporated* association.

The Department's other arguments are similarly unavailing.  True, "the 'O' in DAO stands for '*organization*.'"  Cross-Mot. 21.  But the other two words in the acronym are "decentralized" and "autonomous."  Those modifiers make clear that the word "organization" does not have its common meaning, just as a "server farm" is not actually a "farm."  Likewise, the pages the Department spends objecting to the requirement to show that TORN holders have manifested any agreement to a common purpose, *see* Cross-Mot. 23-24, are of little moment.  It is quite logical that, if a common purpose exists, it would be manifested.  *See* Pls.' Mot. 14-15.  And, in any event, the Department has not shown that individuals holding TORN have any common purpose, much less a manifested one.

Finally, there is no basis for deference to the Department.  *See* Cross-Mot. 19-20.  An agency's interpretation of its regulations is entitled to deference only if the statute it is interpreting is "genuinely ambiguous" after the court has "exhaust[ed] all the traditional tools of construction." *Johnson* v. *BOKF National Association*, 15 F.4th 356, 362 (5th Cir. 2021) (citation omitted).  The Department has not identified any ambiguity here.  And even if the statute were somehow ambiguous, that ambiguity should be resolved in Plaintiffs' favor because of the serious constitutional questions raised by the Department's interpretation.  *See* pp. 17-19, *infra*.; *see also* Blockchain Association Br. 13-15.  Indeed, the Department agrees with Plaintiffs about the relevant test for unincorporated association—it simply cannot satisfy it.

2.  Even if Tornado Cash could somehow be designated as a "national," the Department's designation would still be unlawful because the Department has carved out every member

of that entity from the scope of its designation.  *See* Pls.' Mot. 15-16.  Although it is true that the Department has designated organizations without expressly designating their members, *see* Cross-Mot. 25-26 & n.10, the Department tacitly concedes that it has never before designated an entity, defined it in terms of its members, and then immediately issued guidance that none of those members are included in the designation.  That unexplained contradiction further underscores the oddity of the Department's broad definition of Tornado Cash.

That does not "conflate *whether* Tornado Cash is an entity with precisely *which* individuals form part of the entity's governance."  Defs.' Cross-Mot. 24.  Contrary to the Department's suggestion, applying the agreed test for an unincorporated association would not require the Department specifically to identify each group member by name.  *See id.*  The Department can define an association as an organized body of people who have actually combined to serve that group's purpose—exactly what the Department has failed to do in the designation of Tornado Cash.

*     *     *     *     *

Contrary to the Department's protestations, requiring the designation of a "national" would not allow "any entity or person [to] avoid U.S. sanctions merely by adopting decentralized blockchain governance" or "insulate Tornado Cash from regulatory oversight and accountability."  Cross-Mot. 19.  Whether a group employs blockchain governance or older methods of coordination, the law of unincorporated associations stands ready to hold informally organized groups accountable for their actions.  The Department simply needs to show that an unincorporated association actually exists.  The Department's definition of the Tornado Cash "entity" as including anyone holding one of the 1.5 million outstanding TORN tokens fails to meet the test for unincorporated associations.  The Department's designation of Tornado Cash is improper, not because of

7

some new technological loophole or government-thwarting conspiracy, but for the straightforward reason that the Department cannot carry its statutory burden on the current record.

**B.      The Immutable Smart Contracts Are Not 'Property'**

Even if Tornado Cash were a "national" of some kind, the Department could not prohibit American citizens from using the immutable smart contracts because those immutable smart contracts are not "property."  50 U.S.C. § 1702(a)(1)(B).  The unambiguous meaning of "property" is something that is capable of being owned, which the immutable smart contracts are not.

The Department makes three principal arguments to the contrary.  *First*, the Department attempts to expand the statutory definition of "property" by invoking its regulatory definition of that word.  But there is no ambiguity in the statute for the regulations to interpret, and in any event, the regulatory definition is entirely consistent with the word's plain meaning.  *Second*, the Department suggests that the immutable smart contracts could perhaps be owned in some way, whether outright or in a "qualified" way.  But the Department's arguments are contradicted by the administrative record, which shows that no one does or could own any of the immutable smart contracts, absolutely or otherwise.  *Third*, the Department resorts to policy arguments.  But enforcing the plain language would neither open any loopholes nor enable the evasion of sanctions.

1.      Although the Department does not dispute that dictionaries and binding precedent uniformly define "property" as something that "may be the subject of ownership," Pls.' Mot. 17, it jumps immediately to its own regulatory definition of "property," *see* Defs.' Cross-Mot. 28-29. The regulatory definition of the statutory term "property" is entitled to deference only if the statutory text is ambiguous.  *See, e.g., Forrest General Hospital* v. *Azar*, 926 F.3d 221, 229 (5th Cir. 2019); *Miresles-Zuniga* v. *Holder*, 743 F.3d 110, 112 (5th Cir. 2014); *see also* p. 6, *supra*.  The

Department never argues that the word "property" is ambiguous—and for good reason, as no ambiguity exists.  Accordingly, the Court should apply the plain meaning.[2]

In any event, the statute and the regulation are not in conflict.  The Department's own regulation demonstrates that "property" unambiguously means something that is "susceptible of ownership."  *Meyer* v. *United States*, 364 U.S. 410, 412 n.3 (1960).  All of the numerous examples of "property" in the regulation are things that are capable of being owned.  *See* 31 C.F.R. § 578.314.  For example, no one can doubt that money, checks, bonds, stocks, liens, warehouse receipts, and chattels are capable of being owned.

Likewise, the two forms of property that the Department singles out here—"contracts" and "services"—are similarly capable of being owned.  *See* Cross-Mot. 28-31.  It is possible to own the rights conferred under a contract.  *See*, *e.g.*, *Lynch* v. *United States*, 292 U.S. 571, 577 (1934); *Commissioner* v. *Covington*, 120 F.2d 768, 771 (5th Cir. 1941) (Holmes, J., concurring).  It is also possible to own the rights in a "service," as with a prepaid agreement for trash removal that can be transferred, modified, and withheld from others.  Even if there were ambiguity about whether "services" and "contracts" refer to things that are capable of being owned, it would be eliminated by the canon *noscitur a sociis*.  Under that rule, "particular words or phrases" should be understood "in relation to the words or phrases surrounding them."  *United States* v. *Koutsostamatis*, 956 F.3d 301, 307 n.2 (5th Cir. 2020).  Because all of the other nouns in the regulatory definition of "property" are capable of ownership, the same goes for "contracts" and "services."

Finally, the Department briefly invokes the concept of "qualified property interest," but it never explains how that concept includes ownerless, immutable, open-source computer code.  *See*

---

[2] To the extent the Department briefly suggests that "property" is a "term of art," Cross-Mot. 29, it fails to explain what well-defined, specialized meaning the term "property" has under IEEPA.  *See, e.g.*, *Streber* v. *Hunter*, 221 F.3d 701, 722 (5th Cir. 2000).

Cross-Mot. 31.  For example, the Department notes that rights in certain animals are often described as "qualified property."  *Id*.  But that does not change the fact that those animals can be owned.  *Benjamin* v. *Town of Islip*, Civ. No. 20-56, 2021 WL 8344132, at *13 n.7 (E.D.N.Y. Aug. 12, 2021); 2 William Blackstone, *Commentaries on the Laws of England* 391 (1772); *see also Altman* v. *City of High Point*, 330 F.3d 194, 200-205 (4th Cir. 2003).  An interest in bailed property can also be described as "qualified property interest", but bailed property too is "very capable of absolute ownership."  2 Blackstone at 395.  That usage of "qualified property interest" merely underscores Plaintiffs' point:  the immutable smart contracts are property only if they are capable of being owned.[3]

2.      The Department next incorrectly argues that those immutable smart contracts are capable of being owned.  The Department first suggests that the smart contracts are legal contracts or agreements to provide services, citing a series of decisions in which courts accepted as true allegations that unrelated smart contracts were "contracts."  *See* Cross-Mot. 29-31.  But as the Department concedes, some smart contracts are not legal contracts.  *See* Cross-Mot. 30 n. 12.  The immutable smart contracts in this case illustrate why.  Any contract requires "[a]n agreement between two or more parties."  Contract, *Black's Law Dictionary* 318 (11th ed. 2019).  A smart contract that has been immutably deployed to the blockchain and that no one has the power to control or modify cannot make or accept an offer.  The Department's vending machine analogy illustrates precisely that point:  a vending machine with *no* owner and *no* operator cannot possibly

---

[3] Although a person could arguably have a qualified property interest in his continued use of "fire," "light," "air," and "water," 2 Blackstone at 395, the Department does not actually argue that it has the power to block transactions involving those things.  Even if it did, the right to continued use is capable of being owned.  *See id*. (describing that right as "precarious and qualified ownership").

be a tool for offering or accepting unilateral contracts, because it cannot be operating on anyone's behalf. *See* Cross-Mot. 29-30.

The Department next contends that the immutable smart contracts are capable of being owned because immutability can be circumvented by "build[ing] a new [contract], and us[ing] that one instead." Cross-Mot. 26. But the record makes clear that the immutable smart contracts here were made ownerless and immutable before the DAO existed and have never been upgraded or replaced. *See, e.g.*, A.R. 358, 531, 720, 954, 956-957. The possibility that someone could create new and different smart contracts does not prove that the existing smart contracts can be owned.

Similarly, the Department cannot show that the immutable smart contracts are capable of being owned simply because some people have the ability to interfere with how others use them. *See* Cross-Mot. 32. Deleting links in certain locations or refusing to validate transactions involving the smart contracts does not establish that the immutable smart contracts can be owned. Although such interference could reduce use of the immutable smart contracts, it is not because anyone owns them. If a search engine were to remove a website from its results or an internet service provider were to block traffic to a website because it contained a particular mathematical equation, it would not prove that anyone could own the mathematical equation. Although it is possible for others to encourage or discourage the use of the immutable smart contracts, it is *not* possible for anyone to exert any proprietary authority to control or modify the immutable smart contracts themselves.

The Department also observes that the Tornado Cash "entity" may have the ability to profit from others' use of the smart contracts under "certain conditions." *See* Cross-Mot. 32-33. Even if some members of the purported "entity" stood to profit, profiting from something is not the same as owning it. For instance, streaming services may have profited from the pandemic, but that does

not mean that the pandemic is capable of being owned.  The Department has thus failed to establish that the immutable smart contracts can be owned.

3.      Contrary to the Department's suggestion, an entity does not "insulate itself from sanctions" by giving away or disclaiming its property interests before it has been sanctioned.  *See* Cross-Mot. 27.  In that circumstance, the purpose of IEEPA—depriving certain foreign nationals of the benefits of their property—would be accomplished by the foreign national's own actions. It would hardly subvert the Department's efforts if a hostile foreign actor voluntarily and irrevo-cably gave away all his property before any sanctions were ever imposed.  And here, the immutable smart contracts were made immutable years before the Department's unprecedented designation, to protect consumers from theft and fraud by ensuring that no one could withdraw assets except the user who deposited them.  *See* AR 357, 719.

The requirement of "property" is central to IEEPA, not a loophole.  If Congress wishes to expand IEEPA to authorize the regulation of ownerless software, it may do so.  Because the im-mutable smart contracts are not "property," they cannot be the target of a statute explicitly directed at "property" and "interests in property."  For that independent reason, the designation should be set aside.

### C.      The Purported Tornado Cash Person Does Not Have An 'Interest' In Property In The Immutable Smart Contracts

The Department has authority to prohibit transactions in which a foreign national has an "interest" in property.  As the Department concedes, that means a legal, equitable, or beneficial interest in property.  *See* Pls.' Mot. 18-22; Defs.' Cross-Mot. 32-33.  Because the Department appears to agree that the purported Tornado Cash entity has no legal or equitable claim to the immutable smart contracts, *see* Cross-Mot. 34, the only question is whether "Tornado Cash has

.  .  .  a beneficial interest in [those] smart contracts." Defs.' Cross-Mot. 34.  There is no such interest here.  *See* Pls.' Mot. 18-22.

Although the parties disagree about the meaning of "beneficial interest," the end result is the same under either definition.  The term's ordinary meaning is a "right or expectancy in something (such as a trust or an estate) as opposed to legal title."  Beneficial Interest, *Black's Law Dictionary* 149 (11th ed. 2019).  The Department instead defines a beneficial interest as a right to "control and use" the property in question.  Cross-Mot. 34.  Under either test, the purported Tornado Cash "entity" does not have a beneficial interest in property in the immutable smart contracts.  The Department has not suggested that the Tornado Cash entity has a "right or expectancy" in the immutable smart contracts.  Nor has the Department explained how the purported Tornado Cash entity could have a proprietary right to "control and use" the immutable smart contracts, because no one has any proprietary right to control or use them.

Tellingly, the Department never actually applies its own test to the purported "property" at issue here—the ownerless and immutable smart contracts.  Instead, the Department applies the test to something else:  the TORN tokens that the Tornado Cash "entity" receives when certain relayer transactions occur.  *See* Cross-Mot. 34.  But that misses the point of the inquiry entirely.  Even if the ability to control and transfer valuable crypto tokens demonstrates a property interest in those tokens, it would not demonstrate a property interest in the immutable smart contracts, which no one can control or transfer.

After applying its preferred test to the wrong thing, the Department admits that its "beneficial interest" theory boils down to anticipated indirect economic benefits:  "Tornado Cash actively promotes its smart contracts to increase its user base, because  .  .  .  [m]ore smart contract users means more 'relayer' transactions that transfer fees to the Tornado Cash DAO," and because

"more users also increases the value of TORN."  Cross-Mot. 27, 34-35.  To be clear, the immutable smart contracts do not confer any fees directly to the Tornado Cash "entity."  *See* A.R. 32.  Rather, the Department's theory appears to be one of cascading economic causation:  the more users that interact with the immutable smart contracts, the more likely people would use a separate, optional third-party relayer service—all of which would result in fees paid to the Tornado Cash entity and a higher value of TORN.[4]  No court has embraced such a sweeping and atextual understanding of IEEPA.  Indeed, in both of the decisions which the Department cites on this point, the courts appeared to conclude that the agency had identified a beneficial interest in property, not a possibility of receiving future indirect profits.  *See Holy Land Foundation for Relief & Development* v. *Ashcroft*, 333 F.3d 156, 163 (D.C. Cir. 2003); *Global Relief Foundation, Inc.* v. *O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002); *see also* Defs.' Cross-Mot. 34 n.15.

The Department's argument that some interactions with the immutable smart contracts predictably and indirectly cause profits to flow to the Tornado Cash "entity" is not a theory about interests in property at all.  If there were any doubt, consider the Department's own analogy of a vending machine that sells 83% Coca-Cola products.  *See* Cross-Mot. 35.  Assume the vending machine is owned by someone else, who buys Coca-Cola to stock the machine.  The fact that Coca-Cola will make an indirect profit from 83% of sales—because the machine's owner will go buy more cans as a result—does not give Coca-Cola a "beneficial interest" in that machine.  Having one's product stocked in a machine does not create a "right or expectancy" in the machine itself or mean that Coca-Cola "controls or uses" the machine.  That example reveals the Department's theory for what it is:  an assertion that the Department can regulate any economic activity that it

---

[4] In any event, the Department admits that many people use the immutable smart contracts without involving any relayer and that such transactions do not result in any commissions.  *See* Cross-Mot. 34.

believes will lead to profit for foreign nationals, regardless of whether it involves property in which those foreign nationals have an interest.

The Department's profit-causation theory would be far-reaching.  *See* Pls.' Mot. 19-20. After all, domestic driving surely causes higher profits for designated foreign oil companies.  *See* Pls.' Mot. 21.  The Department's only answer is that the oil firms' profits would be "attenuated and speculative," while the profits of Tornado Cash are supposedly "direct."  Cross-Mot. 36 n.17. That distinction raises more questions than it answers.  For example, the Department never explains how one might draw the line between the foreseeable profits that are sufficiently direct and those that are supposedly too attenuated.  Nor does the Department explain how that distinction might be rooted in IEEPA.

At times, the Department seems to recognize that profiting from something is different than having a property interest in it, conceding (as it must) that a power company does not own the weather.  *See* Cross-Mot. 28 n.12.  But the Department immediately resorts to noting that the power company may have a property interest in solar panels.  *See id.*  At risk of stating the obvious, the power company has a property interest in solar panels only if it owns them.  That is exactly the kind of ownership interest the Department has failed to show here.

For much the same reason, it is irrelevant whether use of the immutable smart contracts tends to raise the price of TORN on the secondary market, benefiting TORN holders.  *See* Defs.' Cross-Mot. 27.  As an initial matter, that argument is factually incorrect, contradicting record evidence that the price of TORN actually *decreased* as the popularity of the smart contracts increased. *See* A.R. 62, 739, 957, 1179, 1596.  But even if the price had moved in the way the Department supposes, it still would not establish a beneficial interest in the immutable smart contracts.  Rather, it would just be another way in which TORN holders may have been well-positioned to profit from

the success of a privacy protocol that neither they nor anyone else owned, which does not qualify as the interest in property required by statute.

Rather than identifying a property interest of any kind, the Department attempts to rest on the standard of review, noting that Tornado Cash's efforts in advertising the privacy service and setting up a rewards system are "highly probative circumstantial evidence" of an interest in the immutable smart contracts.  *See* Cross-Mot. 35-36.  But all of those efforts are explained by the Department's own theory that the Tornado Cash "entity" will tend to profit from increased use of the immutable smart contracts.  *See* Cross-Mot. 27; A.R. 61.  An 83% market share would give Coca-Cola an incentive to drive traffic to vending machines, but it would not give Coca-Cola a property interest in the machines themselves.  Indeed, the Department's theory has always been that the Tornado Cash "entity" made those investments because it was well-positioned to profit from increased use of the immutable smart contracts.  *See* A.R. 60-64.  Nothing in the record supports an inference the Tornado Cash "entity" holds some legal, equitable, or beneficial interest in the immutable smart contracts.  Deferential review cannot change that.

Finally, the Department appears to argue that Tornado Cash has a beneficial interest in the immutable smart contracts because developers spent resources developing the immutable smart contracts, instituting a trusted setup ceremony, and creating the TORN token.  *See* Cross-Mot. 35.  But creating a smart contract over which control is later permanently relinquished, or performing steps permanently to relinquish control of a smart contract, does not create a beneficial interest.  Quite to the contrary, it severs any such interest that might have existed.  *See* Pls.' Mot. 19-20.

Enforcing the plain language would not "subvert the entire purpose of sanctions."  Defs.' Cross-Mot. 34.  After all, the Department might have been able properly to designate other smart

contracts, such as the relayer contracts that can be controlled by an administrator.[5]   It was the Department that sought to reach further, designating immutable code that neither the purported Tornado Cash "entity" nor anyone else controls, uses, or owns in any way.  By purporting to designate open-source code which is not property and in which no foreign national has any property interest, it is the Department's action that would "subvert the entire purpose of sanctions," turning a property-sanctions regime into a general-purpose regulatory tool without limit.

Because the purported Tornado Cash entity does not have an "interest" in property in the immutable smart contracts, the designation exceeded the Department's authority under IEEPA. For that reason as well, the designation of the smart contracts should be set aside.

## II.    THE DEPARTMENT'S ACTION VIOLATES THE FREE SPEECH CLAUSE OF THE FIRST AMENDMENT

The designation of Tornado Cash prohibits Plaintiffs and thousands of other law-abiding American citizens from interacting with open-source code to engage in a wide range of speech protected by the First Amendment.  The designation is not narrowly tailored and is overbroad, and the Department's arguments to the contrary lack merit.

### A.    The Department's Action Is Not Narrowly Tailored To Address A Compelling Interest

1.    As an initial matter, the Department's action implicates the First Amendment.  The Department argues that Plaintiffs "remain free to donate money" and engage in their protected speech through "other means of sending money (whether through cryptocurrency or more traditional means, like bank transfers)."  Cross-Mot. 36-37, 40.  The Department has no authority to

---

[5] To be clear, the current designation of all the Tornado Cash smart contracts was improper because the Department has not identified a sanctionable foreign "national."  *See* pp. 3-7, *supra*. In any event, the Department has not argued that any unlawful part of the designation should be severed.  Accordingly, the Department has forfeited any such argument.  *See Rollins* v. *Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

abridge Plaintiffs' "liberty of expression . . . on the plea that it may be exercised in some other place," *Schneider* v. *New Jersey*, 308 U.S. 147, 163 (1939), simply because Plaintiffs "have alternate forums" available to them, *Chicago Area Military Project* v. *City of Chicago*, 508 F.2d 921, 926 (7th Cir. 1975); *see also Hobbs* v. *Hawkins*, 968 F.2d 471, 481 (5th Cir. 1992); Andreessen Horowitz Br. 7.  Nor does the Department identify the source of its self-proclaimed authority to require American citizens to seek a license as a prerequisite to engage in protected speech.  *See* Cross-Mot. 37-38; *cf. Freedom From Religion Foundation* v. *Abbott*, 955 F.3d 417, 427 (5th Cir. 2020).

The Department further asserts that the designation does not "cause any incidental limitations on Plaintiffs' access to or interaction with [Tornado Cash] code."  Cross-Mot. 37.  That argument is puzzling.  It is unclear how anyone could be free to interact with open-source code that, in response to every interaction from individual users, is programmed to perform one (and only one) function that would trigger potential criminal penalties.  *See* Pls.' Mot. 5-6.

2.      The Department next claims that the designation of Tornado Cash is narrowly tailored because "OFAC could not have reasonably taken any narrower action than sanctioning Tornado Cash."  Cross-Mot. 41.  The Department apparently designated Tornado Cash in furtherance of an interest in preventing money laundering.  *See id.*; A.R. 44-51.  But the Department's pursuit of that interest was anything but narrowly tailored.  Despite labeling Tornado Cash as a "for-profit money laundering service" and arguing that the Department needed to designate Tornado Cash to prevent money laundering, the Department has mustered a grand total of *three* examples of money laundering out of the millions of transactions that Tornado Cash processes.  *See* A.R. 68-77.  Although the Department argues that it ought to be able to sanction "the very platform that facilitates"

18

the illegal conduct, Cross-Mot. 41, it fails to explain why that same argument would not allow it to sanction any bank that inadvertently facilitates money laundering on a handful of occasions.

### B.     The Department's Action Is Unconstitutionally Overbroad

The Department's argument that the prohibition of Tornado Cash is not overbroad because it "merely prevents persons subject to U.S. jurisdiction from using one particular cryptocurrency mixer," and Plaintiffs remain "free to make donations to support important political and social causes" through "any of countless lawful platforms and methods," once again goes too far.  Cross-Mot. 43 (internal quotation marks and citation omitted).  Even if the availability of alternative means to engage in protected speech were relevant to the constitutional inquiry, Plaintiffs have no practical, private way to use their crypto assets to engage in socially valuable and constitutionally protected speech.  "The ability to transact without fear of public exposure is an interest held dear amongst populations across the globe."  EFF Br. 10.  Tornado Cash had the "highest volume of users and transactions, which ensures greater anonymity by making it more difficult to trace particular Ether to particular users."  Welch Decl. at 2; *see also* J. Van Loon Decl. at 3 (noting that "alternative protocols would [not] be as safe and convenient"); Blockchain Association Br. 3.  The Department's designation thus risks prohibiting a substantial amount of protected speech relative to any legitimate sweep of the designation.  *See United States* v. *Williams*, 553 U.S. 285, 292 (2008).

19

**CONCLUSION**

Plaintiffs' motion for partial summary judgment on Counts 1 and 2 should be granted, Defendants' cross-motion should be denied, the designation should be held unlawful and set aside, and Defendants should be permanently enjoined from enforcing it.

Dated:  May 24, 2023                                      /s/ Kannon K. Shanmugam

CHARLES LEWIS AINSWORTH                    KANNON K. SHANMUGAM*
   (Texas Bar #00783521)                        BRIAN M. LIPSHUTZ*
PARKER, BUNT & AINSWORTH, P.C.              MATTEO GODI*
   100 East Ferguson, Suite 418               JENNIFER K. CORCORAN*
   Tyler, TX 75702                            PAUL, WEISS, RIFKIND,
   (903) 531-3535 (telephone)                    WHARTON & GARRISON LLP
   charley@pbatyler.com                          2001 K Street, N.W.
                                                 Washington, DC 20006
                                                 (202) 223-7300 (telephone)
                                                 kshanmugam@paulweiss.com

                                              * Admitted pro hac vice

                                              Attorneys for Plaintiffs
                                              Joseph Van Loon, Tyler Almeida,
                                              Alexander Fisher, Preston Van Loon,
                                              Kevin Vitale, and Nate Welch

20