# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| **JOSEPH VAN LOON** *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:23-cv-312-RP |
| **DEPARTMENT OF THE TREASURY** *et al.*, | |
| Defendants. | |

# DEFENDANTS' REPLY IN SUPPORT OF THEIR
# CROSS-MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................1

ARGUMENT ...............................................................................................................2

I.   Tornado Cash Is an Entity That May Be Designated .....................................2

II.  The Tornado Cash Smart Contracts Are Property .........................................7

III. Tornado Cash Has a Property Interest in Its Smart Contracts ......................11

IV.  Defendants Are Entitled to Summary Judgment on the First Amendment Claim ..................14

     A.  The Designation Does Not Implicate Plaintiffs' Protected Speech ...................15

     B.  The Designation Is Narrowly Tailored and Is Not Overbroad .........................17

CONCLUSION ............................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Bd. of Trs. of State Univ. of N.Y. v. Fox*,
   492 U.S. 469 (1989) ................................................................................................ 18

*Chevron U.S.A. Inc. v. NRDC*,
   467 U.S. 837–45 (1984) .......................................................................................... 5

*Chicago Area Military Project v. City of Chicago*,
   508 F.2d 921 (7th Cir. 1975) ................................................................................. 15

*Commodity Futures Trading Comm'n v. Ooki DAO*,
   No. 3:22-CV-05416-WHO, 2022 WL 17822445 (N.D. Cal. Dec. 20, 2022) ................... 7

*Coniston Corp. v. Vill. of Hoffman Ests.*,
   844 F.2d 461 (7th Cir. 1988) ................................................................................. 9

*Consarc Corp. v. Iraqi Ministry*,
   27 F.3d 695 (D.C. Cir. 1994) ........................................................................ 4, 5, 8

*Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*,
   545 F.3d 4 (D.C. Cir. 2008) ................................................................................... 18

*Freedom From Religion Foundation v. Abbott*,
   955 F.3d 417 (5th Cir. 2020) ................................................................................. 16

*Global Relief Found., Inc. v. O'Neill*,
   315 F.3d 748 (7th Cir. 2002) ................................................................................. 11

*Hersh v. U.S. ex rel. Mukasey*,
   553 F.3d 743 (5th Cir. 2008) ................................................................................. 19

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   219 F. Supp. 2d 57 (D.D.C. 2002) .................................................................... 5, 17

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
   333 F.3d 156 (D.C. Cir. 2003) ......................................................................... 12, 14

*Johnson v. BOKF Nat'l Assoc.*,
   15 F.4th 356 (5th Cir. 2021) .................................................................................. 4

*L.A. Police Dep't v. United Reporting Pub. Corp.*,
   528 U.S. 32 (1999) ................................................................................................. 19

*Moose Lodge No. 107 v. Irvis*,
   407 U.S. 163 (1972) ............................................................................................... 17

*Olenga v. Gacki*,
  507 F. Supp. 3d 260 (D.D.C. 2020) ............................................................................ 5

*Schneider v. State*,
  308 U.S. 147 (1939) .................................................................................................... 15

*Stinson v. United States*,
  508 U.S. 36 (1993) ....................................................................................................... 5

*United States v. Koutsostamatis*,
  956 F.3d 301 (5th Cir. 2020) ...................................................................................... 9

*United States v. Williams*,
  553 U.S. 285 (2008) .................................................................................................... 19

*Wash. Post v. McManus*,
  355 F. Supp. 3d 272 (D. Md. 2019), *aff'd in other part*, 944 F.3d 506 (4th Cir. 2019) ...................... 17

**Statutes**

50 U.S.C. § 1702 .......................................................................................................... 2, 3, 4
50 U.S.C. § 1704 .............................................................................................................. 7, 12

**Restatement of the Law**

*Restatement (Second) of Contracts*
  § 45 (1981) ..................................................................................................................... 8

**Regulations**

31 C.F.R. § 510.305 ........................................................................................................ 2, 6, 7
31 C.F.R. § 510.322 ........................................................................................................... 2, 7
31 C.F.R. § 510.323 ........................................................................................................... *passim*
31 C.F.R. § 575.201 ............................................................................................................. 5
31 C.F.R. § 578.305 ........................................................................................................ 2, 3, 6, 7
31 C.F.R. § 578.309 ........................................................................................................... 11
31 C.F.R. § 578.313 ........................................................................................................... 2, 7
31 C.F.R. § 578.314 ........................................................................................................... *passim*
31 C.F.R. § 578.802 ............................................................................................................. 7

**Executive Orders**

Exec. Order No. 12,724, 55 Fed. Reg. 33,089 (1990) ................................................. 5
Exec. Order No. 13,694, 80 Fed. Reg. 18,077 (Apr. 2, 2015) .................................. 7
Exec. Order No. 13,722, 81 Fed. Reg. 14,943 (March 18, 2016) ............................. 2
Exec. Order No. 13,757, 82 Fed. Reg. 1 (Jan. 3, 2017) ........................................... 2

**Other**

Black's Law Dictionary (11th ed. 2019) ................................................................................. 11, 16

OFAC *FAQ*, No. 567,
    https://perma.cc/F7XD-MM8H ........................................................................................ 6

OFAC, Nicaragua General License No. 2A (Aug. 5, 2019),
    https://perma.cc/FB2V-CV43 ........................................................................................ 6

Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Nicaraguan National
Police and Police Commissioners Involved in Human Rights Abuse (Mar. 5, 2020),
    https://perma.cc/N8PT-W28V ........................................................................................ 6

## INTRODUCTION

The summary judgment record establishes that the Office of Foreign Assets Control (OFAC) properly designated Tornado Cash, a for-profit money laundering service, pursuant to the International Economic Emergency Powers Act (IEEPA) and the relevant executive orders. Tornado Cash is a group of individuals who are organized to act in concert, and who operate, promote, and update their mixing service for anonymous digital currency transactions to generate a financial windfall. Moreover, Tornado Cash's smart contracts fall squarely within the regulatory definition of "property" because they constitute "contracts of any nature whatsoever," "services of any nature whatsoever," or "any other property . . . tangible or intangible[.]" 31 C.F.R. §§ 510.323, 578.314.

Plaintiffs oppose summary judgment in Defendants' favor on legal grounds, first contending that the Court should apply their overly narrow definition of the term "property" based on absolute ownership. That argument falls flat; Congress expressly and unequivocally delegated to the President (and, in turn, the Secretary of the Treasury) the authority to define by regulation the broad statutory terms contained in IEEPA. Further, Tornado Cash has a beneficial interest in the smart contracts it created, utilized, and deployed because it designed those contracts to remit fees to Tornado Cash whenever users employ relayers (as they do for nearly 84% of transactions). And finally, Tornado Cash's designation does not implicate First Amendment interests. Plaintiffs do not contest that they remain able to donate money to causes of their choosing using any other method or platform, and they remain free to interact with Tornado Cash's open-source code, as reflected in OFAC's public guidance. Even if Plaintiffs' First Amendment–protected interests were implicated, the designation easily satisfies intermediate scrutiny.

For all these reasons, as further discussed below, the Court should reject Plaintiffs' meritless challenges to OFAC's designation.

**ARGUMENT**

**I.      Tornado Cash Is an Entity That May Be Designated**

Contrary to Plaintiffs' assertion, the Government does not agree (or concede) that Plaintiffs' "unincorporated association" test, imported from inapposite areas of law, is dispositive. *See* Pls.' Reply in Supp. of Mot. for Partial Summ. J. and Opp'n to Defs.' Cross-Mot. for Summ. J ("Pls.' Opp'n") at 3, 5, ECF No. 87.   Indeed, the Court should apply the regulatory definition of "entity"—*i.e.*, association, group, or other organization—and should afford those terms their ordinary meaning. *See* Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Cross-Mot.") at 20–21, ECF No. 80 (citing 31 C.F.R. §§ 510.305, 510.322, 578.305, 578.313).   Tornado Cash constitutes an organization that provides an online, for-profit money laundering service.   Despite Tornado Cash's attempt to portray itself as something else, the administrative record demonstrates that Tornado Cash is an entity that consists of individuals organized to function collectively for a common purpose, and is therefore properly designated under IEEPA.

Plaintiffs continue to conflate the personhood and foreign-nexus requirements by incorrectly insisting that only a "foreign country or national thereof" may be designated under IEEPA. *See* Pls.' Opp'n at 3–4, & n.1, 17 n.5.   This misconstrues the operative legal framework.   Under IEEPA, "a foreign country or a national thereof" must have *an interest in the property* that is blocked pursuant to the designation. *See* 50 U.S.C. § 1702(a)(1)(B).   But separately, "any person" may be designated who fits criteria of the relevant executive orders issued pursuant to IEEPA. *See* Exec. Order No. 13,722, § 2(a)(vii), 81 Fed. Reg. 14,943 (March 18, 2016); Exec. Order No. 13,757, § 1(a)(ii), (iii)(B), 82 Fed. Reg. 1 (Jan. 3, 2017).   The relevant regulations, in turn, define "person" as an "individual or entity," and an "entity" as "a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization." 31 C.F.R. §§ 510.305, 510.322, 578.305, 578.313.   The President's authority under IEEPA thus extends to the property of certain (1) partnerships, associations, trusts, joint ventures,

corporations, groups, subgroups, or other organizations, as delineated by the applicable executive order, 31 C.F.R. § 578.305; (2) "in which any foreign country or a national thereof has any interest . . . subject to the jurisdiction of the United States," 50 U.S.C. § 1702(a)(1)(B); *see* A.R. 32–43, 64–67. Plaintiffs' continued attempt to assess whether Tornado Cash is a "foreign national" thus remains off-base.[1] *See, e.g.*, Pls.' Opp'n at 3 n.1.

To begin, Defendants have established that Tornado Cash satisfies the ordinary definition of an organization, association, or group because its structure comprises an organized body of individuals that furthers a common purpose.[2] *See* Defs.' Cross-Mot. at 21; *see also* A.R. 42–43. Tornado Cash's structure consists of: (1) its founders and developers, who launched the mixing service, developed new features, created the Tornado Cash decentralized autonomous organization (DAO), and actively promote the platform's popularity to increase its user base; and (2) its DAO, which is responsible for governing the platform, including voting on and implementing new features created by the developers. A.R. 1, 16, 32. This structure has allowed Tornado Cash to take "concrete and coordinated steps to deploy, manage, promote, and profit from the Tornado Cash mixing service," including by: (1) placing job advertisements, *id.* at 17; (2) maintaining a treasury, or "community fund," from which it offers developers rewards for improving its code, *id.* at 41–43; (3) organizing code deployment ceremonies, wherein participants play a role in making changes to the service, *id.* at 39; (4) refining its protocol to

---

[1] For similar reasons, it is incorrect to suggest that OFAC may only designate organizations "deemed or construed to be governed by a particular law" or who "reside[] in a particular country." Pls' Opp'n at 3 n.1.

[2] Plaintiffs assert that Defendants have defined Tornado Cash as consisting of anyone who possesses "one of the 1.5 million outstanding TORN tokens." *See* Pls.' Opp'n at 4. Not so. To be clear, Tornado Cash's structure consists of its founders, developers, and DAO, *see* A.R. 1, 16, 32, which act for a common purpose, making it an entity under OFAC's regulations. *See* 31 C.F.R. § 578.305. The total number of TORN holders—whether or not they actively participate as members of the DAO—is irrelevant.

enhance anonymity, *id.* at 35; and (5) adopting a compensation structure through "relayer" payments, *id.* at 60–64.[3]

Even if the foreign nexus requirement were properly at issue, the designation fully satisfies that condition because a foreign country and nationals thereof have an interest in the blocked property. *See* A.R. 64–67. OFAC established that the Democratic People's Republic of Korea (North Korea) has an interest in the blocked Tornado Cash tool. A.R. 64–65. Persons acting on behalf of North Korea transferred funds to Tornado Cash between October 19, 2020, and October 21, 2020, and repeatedly used Tornado Cash to launder stolen assets. A.R. 65. Further, two of Tornado Cash's founders and developers—Alexey Pertsev and Roman Semenov—are foreign nationals "who likely received a portion of the 30% of available TORN tokens." A.R. 66. And three foreign entities— Binance, OKEx, and 1inch—hold a considerable quantity of TORN. A.R. 66–67. Whether Tornado Cash itself is a foreign "national"(Pls.' Opp'n at 3–8) is beside the point; a foreign government and foreign nationals have an interest in the blocked property, and this is all IEEPA requires. *See* 50 U.S.C. § 1702(a)(1)(B); *see also* Section III, *infra*.

Plaintiffs' contrary arguments fail to undermine OFAC's decision. Plaintiffs assert that OFAC's definition of the term "entity" is not owed deference because Defendants have not identified "any ambiguity." *See* Pls.' Opp'n at 6 (citing *Johnson v. BOKF Nat'l Assoc.*, 15 F.4th 356, 362 (5th Cir. 2021)). Not so. In fact, "extreme deference" is owed, not because of any statutory ambiguity, but because OFAC's application of its own regulations implicate sensitive national security and foreign policy considerations. *See, e.g.*, *Consarc Corp. v. Iraqi Ministry* ("*Consarc I*"), 27 F.3d 695, 702 (D.C. Cir. 1994) (OFAC's application of its own regulations "receives an even greater degree of deference than

---

[3] Tornado Cash's structure is more formalized than the structure of many other entities OFAC has long designated, like narcotics trafficking groups, proliferators of weapons of mass destruction, terrorist groups, and those who provide support for malicious cyber-enabled activities. *See* Defs.' Cross-Mot. at 3–4.

the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation"); *Olenga v. Gacki*, 507 F. Supp. 3d 260, 280 (D.D.C. 2020) ("The D.C. Circuit has shown extreme deference to [OFAC] blocking orders, which fall at the intersection of national security, foreign policy, and administrative law." (citation omitted)); *Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land I*"), 219 F. Supp. 2d 57, 84 (D.D.C. 2002) (OFAC's orders are "an important component of U.S. foreign policy, and the President's choice of this tool . . . is entitled to particular deference").  Plaintiffs have no response to this authority.  *See* Pls.' Opp'n at 6.  Regardless, the Court should look to the definition of "entity" in OFAC's regulations, not ignore it in favor of some other generic definition.  *See id.*

The D.C. Circuit's decision in *Consarc I* underscores this point.  *See* 27 F.3d at 701–02. Addressing whether the Government of Iraq had "property or [a] property interest" in letters of credit ordered to be transferred to the plaintiff, which was prohibited by the Iraqi Sanctions Regulations, the D.C. Circuit concluded that "OFAC may choose and apply its own definition of property interests, subject to deferential judicial review."  *Id.* at 701 (citing 31 C.F.R. § 575.201(a)).  That court observed that (1) the President had the authority to "issue such regulations, including regulations prescribing definitions, as may be necessary for the exercise of the authorities granted by this chapter," and (2) the President had subsequently delegated "his power to define the statutory terms to the Secretary of the Treasury."  *Id.* (citing Exec. Order No. 12,724, 55 Fed. Reg. 33,089 (1990)).  "By these provisions OFAC has received the authority to administer the statute . . . so that we must give effect to OFAC's regulations unless they contradict express statutory language or prove unreasonable."  *Id.* (citing *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 844–45 (1984)).  The court ultimately concluded that OFAC's application of its own regulations "receives an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with the regulation."  *Id.* at 702 (citing *Stinson v. United States*, 508 U.S. 36, 45 (1993)).

5

Nor is OFAC's designation unlawfully underinclusive.  Plaintiffs incorrectly contend that the Tornado Cash designation is "unlawful" because Defendants "carved out every member of that entity from the scope of its designation."  Pls.' Opp'n at 6–7.  But OFAC did not "carve out" anyone; it exercised its discretion to designate only the entity Tornado Cash, not the individuals who operate it, which is not unique.  *See* Defs.' Cross-Mot. at 3–4, 25–26.  And then OFAC provided public guidance about the designation's scope—including that the Government did not designate individual members of the DAO or Tornado Cash's founders.  *See id.* at 25.  Issuing such guidance is likewise not unique. *See, e.g.*, Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Nicaraguan National Police and Police Commissioners Involved in Human Rights Abuse (Mar. 5, 2020), https://perma.cc/N8PT-W28V (explaining that OFAC designated the Nicaraguan National Police but not the individual police officers); OFAC, Nicaragua General License No. 2A (Aug. 5, 2019), https://perma.cc/FB2V-CV43 (authorizing the payment of salaries by the Nicaraguan National Police to its employees); OFAC *FAQ*, No. 567, https://perma.cc/F7XD-MM8H (explaining that blocked company may continue to facilitate salary payments, pension payments, or other benefits to its employees).

Plaintiffs do not—and could not—attempt to meaningfully rebut this showing. Acknowledging organized action on Tornado Cash's behalf, Plaintiffs admit there is "someone . . . using the name 'Tornado Cash'" whom "the Department could have designated[.]"  Pls.' Opp'n at 5. Ample factual evidence establishes that Tornado Cash's organizational structure consists of its founders, developers, and DAO, *see* A.R. 1, 16, 32, which act for a common purpose, so it is an entity that may be designated under OFAC's regulations, *see* 31 C.F.R. §§ 510.305, 578.305.  OFAC did not invent a definition of Tornado Cash, it described how Tornado Cash operates, based on the facts.  *See* Defs.' Cross-Mot. at 18–26.  The total number of TORN holders—and how many actively participate as members of the DAO—is irrelevant, *see* Pls.' Opp'n at 4, because the DAO's existence, along with the other characteristics described above, shows that Tornado Cash is an "organization, association,

or group."[4]  *See* 31 C.F.R. §§ 510.305, 578.305.  Whether OFAC could also have designated individuals is a matter committed to OFAC's discretion.  *Cf. Commodity Futures Trading Comm'n v. Ooki DAO*, No. 3:22-CV-05416-WHO, 2022 WL 17822445, at *4 (N.D. Cal. Dec. 20, 2022) ("That the [Commodity Futures Trading Commission (CFTC)] is choosing to sue the [DAO] rather than the Token Holders individually is a litigation strategy the CFTC is permitted to make[.]").  The agency's evidentiary memorandum shows that Tornado Cash is structured and organized to advance a common goal and is appropriately designated.

## II.    The Tornado Cash Smart Contracts Are Property

Plaintiffs continue to urge the Court to ignore the expansive regulatory definition of "property" in favor of a much narrower interpretation based on absolute ownership.  *See* Pls.' Opp'n at 8–9.  But IEEPA expressly authorizes the President to "issue such regulations, *including regulations prescribing definitions*, as may be necessary for the exercise of the authorities granted by" the statute.  50 U.S.C. § 1704 (emphasis added).  The President then delegated the power to define the statutory terms to the Secretary of the Treasury.  *See* Exec. Order No. 13,694, § 8, 80 Fed. Reg. 18,077 (Apr. 2, 2015) ("The Secretary of the Treasury . . . is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order.").  And in turn, the Secretary of the Treasury delegated this authority to the Director of OFAC.  *See* 31 C.F.R. § 578.802.  Pursuant to this express delegation, OFAC adopted a broad definition of "property" that Plaintiffs ask the Court to disregard.  *See* Defs.' Cross-Mot. at 28 (quoting 31 C.F.R. §§ 510.323, 578.314).

---

[4]  Plaintiffs argue that Tornado Cash cannot be compared to a corporation because corporations must satisfy formal registration requirements.  Pls.' Opp'n at 5.  Though a corporate form is not necessary to show Tornado Cash constitutes an "entity," its governance mimics a formal corporate structure and is designed to further a common purpose, which satisfies the broad regulatory definition.  *See* 31 C.F.R. §§ 510.322, 578.313.

Plaintiffs contend that the Court should simply overlook the regulatory definition of "property" because Defendants have not argued that the term is ambiguous. *See* Pls.' Opp. at 8–9. Plaintiffs again miss the salient point. OFAC's application of its own regulations "receives an even greater degree of deference than the *Chevron* standard, and must prevail unless plainly inconsistent with that regulation." *Consarc I*, 27 F.3d at 701–02.

Plaintiffs have not and cannot demonstrate that OFAC's application of its regulatory definition is plainly inconsistent with the regulation. *See* Defs.' Cross-Mot. at 29–32. First, Tornado Cash's immutable smart contracts constitute "contracts of any nature whatsoever" in the form of code-enabled unilateral contracts. *Id.* at 29. Even though the smart contracts may be "immutable," *see* Pls.' Opp'n at 8, the fact that something is immutable bears no relation to whether it is property, *see* Defs.' Cross-Mot. at 29. Tornado Cash has made an offer to mix cryptocurrency by advertising its services, publishing its smart contracts, and deploying the smart contracts on the blockchain. *Id.* Once a user becomes aware of Tornado Cash's offer, and chooses to engage in a transaction using the mixing service, the user accepts the terms of the offer, thereby creating an enforceable unilateral contract. *Id.* at 29–30 (citing Restatement (Second) of Contracts § 45 (Am. L. Inst. 1981) ("Where an offer invites an offeree to accept by rendering a performance and does not invite a promissory acceptance, an option contract is created.")). Second, the Tornado Cash smart contracts also constitute "services of any nature whatsoever," namely, the deployed smart contracts facilitate transactions on the blockchain and, in most instances, obscure the senders and recipients in those transactions. *Id.* at 31 (citing 31 C.F.R. §§ 510.323, 578.314). And third, the Tornado Cash smart contracts are "any other property, real, personal, or mixed, tangible or intangible" because they confer a beneficial interest in TORN tokens to the Tornado Cash DAO when a transaction uses a relayer. *Id.* at 32.

In the alternative, Plaintiffs retreat from their primary position that the Court should fully disregard the regulatory definition of "property," and instead argue that "the numerous examples of 'property' in the regulation are things that are capable of being owned," demonstrating the correctness of their favored definition. Pls.' Opp'n at 9. Plaintiffs specifically note that it is "*possible* to own the rights conferred under a contract." *Id.* (emphasis added). But, as Defendants already explained, a contract itself (and not merely the rights it confers) is "property" precisely because it confers the rights to those party to the contract; nobody owns the agreement. *See* Defs.' Cross-Mot. at 32 (quoting *Coniston Corp. v. Vill. of Hoffman Ests.*, 844 F.2d 461, 465 (7th Cir. 1988) (Posner, J.) ("Property is not a thing, but a bundle of rights[.]")); *see also* Pls.' Mot. for Partial Summ. J ("Pls.' Mot.") at 17, ECF No. 41. (acknowledging that the regulatory definition of property includes "something that . . . confers the powers of ownership"). Plaintiffs likewise contend that "it is *possible* to own the rights in a 'service'" memorialized by a pre-paid agreement. *See* Pls.' Opp'n at 9 (emphasis added). Plaintiffs disregard OFAC's unambiguous regulatory definition of property that encompasses "services of any nature whatsoever," *i.e.*, services both memorialized (i) by a written agreement and (ii) those that are not, thus undermining Plaintiffs' argument that "property" must be capable of ownership. 31 C.F.R. §§ 510.323, 578.314. Finally, the canon of *noscitur a sociis* is simply inapposite. *See* Pls.' Opp'n at 9 (citing *United States v. Koutsostamatis*, 956 F.3d 301, 307 n.2 (5th Cir. 2020)). This canon provides that "[a] word may be known by the company it keeps." *Koutsostamatis*, 956 F.3d at 307. Here, however, "services of any nature whatsoever" and "contracts of any nature whatsoever" need no canon of interpretation to afford them meaning—the term "property" encompasses any contract and any service *whatsoever*.

Plaintiffs contend that Defendants have tacitly accepted Plaintiffs' overarching position that the smart contracts are not capable of being owned and thus cannot constitute property. *See* Pls.' Opp'n at 10–12. Plaintiffs are wrong. *See* Defs.' Cross-Mot. at 31–33. Rather, even if, *arguendo*, the

9

Tornado Cash smart contracts were neither contracts nor services, Defendants independently argue that the smart contracts constitute "any other property . . . tangible or intangible" under the pertinent regulations, for a variety of reasons. *Id.* Most importantly, the smart contracts convey beneficial ownership in the fees transmitted to the DAO following relayer-facilitated transactions. *Id.* at 32; *see also* Pls.' Mot. at 17 (acknowledging that the regulatory definition of property includes "something that . . . confers the powers of ownership"). Plaintiffs protest that "profiting from something is not the same as owning it[.]" Pls.' Opp'n at 11. But the smart contracts constitute property because Tornado Cash receives an ongoing financial benefit from them, regardless of whether Tornado Cash owns the smart contracts. Defs.' Cross-Mot. at 31–33. Plaintiffs also assert that the smart contracts cannot qualify as property because the contracts "cannot make or accept an offer." Pls.' Opp'n at 10. Again, the Tornado Cash smart contracts constitute property in the form of a unilateral contract— Tornado Cash offers to provide its mixing services, and its users accept the offer by using the services to execute a transaction. Defs.' Cross-Mot. at 29–30.

Finally, contrary to Plaintiffs' assertion, Defendants do not argue that an entity would "'insulate itself from sanctions' by giving away or disclaiming its property interests before it has been sanctioned." Pls.' Opp'n at 12. Defendants instead argue that Plaintiffs' position would allow a bad actor to transfer its assets to an immutable smart contract to benefit indefinitely and indiscriminately with no sanctions ramifications. *See* Defs.' Cross-Mot. at 33. Defendants' concern is not that a "hostile foreign actor" would "g[i]ve away all of his property," Pls.' Opp'n at 12, but rather that the hostile actor would move its assets to smart contracts and continue to benefit, which Plaintiffs' arguments would place outside the reach of IEEPA and the economic sanctions regime of the United States. Again, such a result would severely undermine the Government's ability to use all of the tools at its disposal to protect this country's national security and advance the foreign policy of the United

States.  *See Global Relief Found., Inc. v. O'Neill*, 315 F.3d 748, 753 (7th Cir. 2002) ("[IEEPA] is designed to give the President means to control assets that could be used by enemy aliens.").

### III.    Tornado Cash Has a Property Interest in Its Smart Contracts

Tornado Cash has a beneficial interest in the deployed smart contracts because they provide it with a means to control and use crypto assets.  *See* Defs.' Cross-Mot. at 34–35; *see also* 31 C.F.R. § 578.309 ("The term interest . . . means an interest of any nature whatsoever, direct or indirect.").  In particular, the Tornado Cash smart contracts are designed to generate fees by transmitting TORN tokens to the DAO when a user undertakes a relayer-facilitated transaction.  Defs.' Cross-Mot. at 34.  The use of relayers is all but essential to users' anonymity, because without a relayer, the user must pre-fund the recipient account with Ether to pay the Ethereum "gas," thus establishing an electronic footprint that Tornado Cash users go to great lengths to avoid.  *Id.*  As previously discussed—and unsurprisingly, given the critical role that relayers play in ensuring anonymity—the pervasiveness of relayer-facilitated transactions cannot be overstated: 83.67% of Tornado Cash transactions use relayers.  *Id.* at 35.

Although Plaintiffs agree that the operative question is whether Tornado Cash has a beneficial interest in the smart contracts, they erroneously contend that no such interest exists.  *See* Pls.' Opp'n at 13.  In particular, Plaintiffs contend that Tornado Cash does not have a "right or expectancy" in the smart contracts.  *See id.* (citing Black's Law Dictionary).  Tornado Cash, however, has a beneficial interest in the smart contracts because they remit TORN tokens to the DAO following relayer-enabled transactions.  *See* Defs.' Cross-Mot. at 34; *see also* A.R. 32, 56, 62.  Regardless, even under Plaintiffs' preferred definition, the result is the same.  *See* Pls.' Opp'n at 12.  Tornado Cash expects the smart contracts will generate revenue by requiring relayers to transfer TORN tokens to the Tornado Cash DAO when the relayers facilitate transactions.  *See* Defs.' Cross-Mot. at 34; *see also* A.R. 32, 56, 62. Accordingly, Plaintiffs' contention that Tornado Cash merely has an interest in the TORN tokens

received by the DAO—but not the smart contracts themselves—is simply incorrect. *See* Pls.' Opp'n at 13.

Plaintiffs also argue that "anticipated indirect economic benefits" cannot establish that Tornado Cash has a beneficial interest in the smart contracts. *See* Pls.' Opp'n at 13–14. But it is undisputed that, since at least March 2022, Tornado Cash has been receiving a continual stream of crypto revenue from the smart contracts in the form of TORN tokens transferred to the DAO for relayer-enabled transactions. *See* Defs.' Cross-Mot. at 34; *see also* A.R. 32, 39, 56, 62. There is nothing "indirect" about the economic benefits Tornado Cash reaps through its relayer fee business model— these are *direct* benefits from the tool Tornado Cash designed and executed. *See* Pls.' Opp'n at 13. While Tornado Cash will anticipate even more fees should more users opt to employ relayers, this only underscores Tornado Cash's present beneficial interest in the smart contracts and its incentive to ensure the pervasiveness of relayer-facilitated transactions. This is not just a "possibility of receiving future indirect profits," as Plaintiffs suggest—the benefit from relayer transactions is all but a certainty. *Id.* at 14. Contrary to Plaintiffs' conclusory assertion that the cases cited by Defendants did not involve "a possibility of receiving future indirect profits," *see id.*, the D.C. Circuit's decision in *Holy Land Foundation for Relief & Development v. Ashcroft* reenforces the Government's point, 333 F.3d 156, 163 (D.C. Cir. 2003). In that case, the D.C. Circuit concluded that Hamas had a beneficial interest in Holy Land's property because the purported charity acted as a fundraiser for the terrorist organization. *Id.* Put another way, Hamas—like Tornado Cash here with respect to its smart contracts—had a beneficial interest in Holy Land's assets because it would profit in the future from the fundraising proceeds comingled with the alleged charity's other assets. *Id.* at 162 ("The language ['any interest' in IEEPA] therefore imposes no limit on the scope of the interest, and OFAC has defined this statutory term, pursuant to explicit authorization from Congress, 50 U.S.C. § 1704, to mean, 'an interest of any nature whatsoever, direct or indirect.'").

Plaintiffs' analogies do not cast doubt on Tornado Cash's beneficial interest in the smart contracts. *See* Pls.' Opp'n at 14–15. To begin, Plaintiffs' new twist on the vending machine analogy makes little sense. *Id.* at 14. Plaintiffs now analogize Tornado Cash to Coca-Cola, as a third-party provider, supplying 83% of the products sold in a vending machine "owned by someone else." *Id.* Plaintiffs argue that Coca-Cola, *i.e.*, Tornado Cash, lacks a beneficial interest in the machine itself even though it may benefit if the vending machine owner buys more Coca-Cola products to stock in the machine. *Id.* Plaintiffs' analogy fails to capture the reality at issue in this case. A more apt comparison would be if Coca-Cola provides its products to a vending machine that Coca-Cola designed, built, shipped, and maintained, from which it now could receive, in perpetuity, a windfall of royalties on 83% of the sales. *See* Defs.' Cross-Mot. at 35. Comparing Tornado Cash to a foreign oil company suffers from similar deficiencies. *See* Pls.' Opp'n at 15. Plaintiffs assert that a foreign oil company would prosper from increased domestic driving, but that does not mean the company has an interest in the cars driven in this country. *Id.*; *see also* Pls.' Mot. at 21. Again, the comparison is a stretch—a more appropriate analogy would be a foreign oil company engineering, manufacturing, deploying, and maintaining a fleet of cars, 83% of which must guzzle the gasoline the company provides. In that scenario, the foreign oil company would surely have a beneficial interest in the cars consuming its product.

Finally, Plaintiffs contend that actions undertaken by Tornado Cash to ensure that it is "well-positioned to profit" from the success of its mixing service do not demonstrate that the entity has a beneficial interest in the smart contracts. *See* Pls.' Opp'n at 15–16. This glosses over the undisputed facts—Tornado Cash created a tool by which it could directly prosper, promoted its services, enhanced the contracts' cryptography, created the digital currency from which it flourished, and

incentivized users to improve the software.[5]  *See* Defs' Cross-Mot. at 35.  Tornado Cash was not merely "well-positioned to profit"; rather, it engaged in a deliberate and calculated venture to maximize the way it would financially thrive from the smart contracts it designed and deployed on the blockchain.  *Id.*  Such actions, coupled with the undisputed, direct economic benefits it receives from the use of its product, provides substantial evidence that Tornado Cash has a beneficial interest in the smart contracts.  *Id.* (citing *Holy Land*, 333 F.3d at 163 ("OFAC needed only to determine that Hamas had an interest in [the] property, and the record provided substantial evidence to support that conclusion.")).

**IV.     Defendants Are Entitled to Summary Judgment on the First Amendment Claim**

Plaintiffs have not demonstrated that the designation of Tornado Cash implicates any First Amendment protected interest, much less that *Plaintiffs'* speech has been abridged or chilled.  Although Plaintiffs' theory—which is unsubstantiated and not affirmatively advanced in either of their briefs— appears to be that the use of a particular cryptocurrency platform to engage in financial transactions is expressive conduct protected by the First Amendment, their opposition brief does not cite a single case involving expressive conduct of any kind.  Rather, the few cases that Plaintiffs cite deal exclusively with pure speech, and most of them address the protection of speech in traditional public fora. Plaintiffs make no attempt to bridge the cavernous gap between the cases they cite and the novel theory that they necessarily ask this Court to adopt.  And even if Plaintiffs had demonstrated that First Amendment interests are implicated here, the designation easily satisfies intermediate scrutiny because

---

[5] Returning to the Coca-Cola analogy, Plaintiffs assert that an "83% market share would give Coca-Cola an incentive to drive traffic to vending machines, but it would not give Coca-Cola a property interest in the machines themselves."  *See* Pls.' Opp'n at 16.  But again, Plaintiffs' analogy does not accurately incorporate the salient facts.  Coca-Cola *would* have a beneficial interest in the vending machines if it, as Tornado Cash has done, decided to design, build, ship, and maintain the machines from which it receives compensation from 83% of the sales.

it is narrowly tailored to achieve the Government's vital interest in preventing money laundering on cryptocurrency platforms and is not overbroad.

### A.  The Designation Does Not Implicate Plaintiffs' Protected Speech

Plaintiffs again fail to identify a single case that would support the contention that they have a First Amendment right to "use . . . crypto assets" on a *particular* platform for financial transactions, or even to transact using cryptocurrency rather than other kinds of currency.  Pls.' Opp'n at 19. Instead, they cherry-pick language from *Schneider v. State*, an inapposite Supreme Court case addressing *distribution of literature* in public places, for the general proposition that the Government may not abridge "liberty of expression . . . on the plea that it may be exercised in some other place."  Pl.'s Opp'n at 18 (quoting 308 U.S. 147, 163 (1939)).  In *Schneider*, the Supreme Court held unconstitutional municipal laws that prohibited the distribution of written materials in a broad range of public places, including sidewalks, streets, and parks.  308 U.S. at 148, 151.  The Court was unpersuaded by the government's argument that the laws "leave[] persons free to distribute printed matter in other public places," because "the streets are natural and proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression *in appropriate places* abridged on the plea that it may be exercised in some other place."  *Id.* at 163 (emphasis added).

As an initial matter, Tornado Cash is not a "public place[]" like a "street, sidewalk or park." *Id.* at 148, 163.  Rather, it is an entity that provides software for financial transactions designed to avoid both public disclosure and the reporting obligations that would ordinarily apply to entities facilitating financial transactions.  Tornado Cash is therefore unlike the kinds of "appropriate places" for "the exercise of [one's] liberty of expression" that the Court addressed in *Schneider*.  *Id.* at 163. *Cf. Chicago Area Military Project v. City of Chicago*, 508 F.2d 921, 926 (7th Cir. 1975) (citing *Schneider* in striking a city law that prohibited the distribution of leaflets at a major metropolitan airport).

Moreover, using a specific entity to engage in a financial transaction is nothing like distributing written materials in a public forum like a street or an airport. Tornado Cash is not a "forum" at all. *See Forum*, Black's Law Dictionary (11th ed. 2019) (defining "forum" as "[a] public place, esp. one devoted to assembly or debate"). And engaging in a financial transaction—which could be considered expressive conduct subject to protection under only limited circumstances—is entirely unlike distributing written materials, which are pure speech always subject to First Amendment protection.[6]

As to their undeveloped claim that the designation implicates purported First Amendment protection of computer code, Plaintiffs do not even attempt to demonstrate any incidental limitation on that assumed protection. They claim to be "puzzl[ed]" by the fact—demonstrated in the blog post on which their opening brief relied—that OFAC's designation does not prohibit interaction with the Tornado Cash code such as accessing, sharing, publishing, and developing that code. Pls.' Opp'n at 18; *see* A.R. at 404–05 (stating that that the code remains available, and the author retains copies of the code, which he uses "as a researcher and instructor" to "teach concepts related to cryptocurrency privacy and zero-knowledge technology"—uses that remain untouched by the designation). Those permitted uses are the very ones that might otherwise implicate free speech (assuming, *arguendo*, that the code itself is speech). That Plaintiffs appear not to understand the distinction between these permitted uses of the source code and the act of *executing* that code by using it to send cryptocurrency

---

[6] Plaintiffs also fault the government for affording individuals the opportunity to apply for licenses to engage in the otherwise prohibited transactions, claiming summarily that the government lacks "authority" to do so and citing (without explanation) *Freedom From Religion Foundation v. Abbott*, 955 F.3d 417, 427 (5th Cir. 2020). Pls.' Opp'n at 18. That case is unhelpful for the same reason that *Schneider* is: it addresses a prior restraint on pure speech in designated public fora, which is not relevant to the circumstances of this case. Moreover, Plaintiffs' criticism of the license provision is, at best, counterintuitive in light of their narrow-tailoring and overbreadth arguments. The license option only highlights the appropriate tailoring of OFAC's action because it indeed allows some individuals to engage lawfully in otherwise prohibited transactions.

on the blockchain, Pls.' Opp'n at 18, only emphasizes their failure to meet their burden of establishing any limitation on a First Amendment–protected interest with respect to the code.

In any event, as detailed in Defendants' opening brief, even if Plaintiffs could show that *someone's* First Amendment rights may be implicated, their affidavits are devoid of allegations that *their own* First Amendment rights have been implicated by the designation. *See* Defs.' Cross-Mot. at 38–39. Plaintiffs offer no response to this. In the absence of any alleged harm to Plaintiffs, their claims cannot rely on alleged harm to third parties, as they "may not seek redress for injuries done to others." *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972).

OFAC's designation has not constrained Plaintiffs' ability to donate funds to causes of their choosing or otherwise engage in "socially valuable speech," Pls.' Mot. at 23, or to interact with the Tornado Cash code. There exists no First Amendment right to use a *particular* medium to engage in financial conduct, just as there exists no constitutional right to use a particular currency. *Cf. Wash. Post v. McManus*, 355 F. Supp. 3d 272, 282 & n.7 (D. Md. 2019) (denying preliminary injunction as to state law provision that "bars political ad buyers from using foreign currency to make their purchases," rejecting plaintiffs' assertion "that the currency restriction is itself an unconstitutional restraint on speech" because they did not cite "any authority for this contention" nor "explain[] how this restriction trenches on their free speech rights, given the ready availability of currency conversion services"), *aff'd in other part*, 944 F.3d 506 (4th Cir. 2019). Because no First Amendment rights are at stake here, the Court need go no further to find in Defendants' favor on Plaintiffs' First Amendment claim.

### B. The Designation Is Narrowly Tailored and Is Not Overbroad

Even if OFAC's designation of Tornado Cash implicated the First Amendment, that designation is narrowly tailored to achieve OFAC's "important and substantial government interest," *Holy Land I*, 219 F. Supp. 2d at 82, in preventing money laundering on cryptocurrency platforms.

Again failing to cite a single case in support, the only response Plaintiffs offer is that Defendants have publicly identified only three examples of money laundering using Tornado Cash. Pls.' Opp'n at 18. But that is hardly relevant to the question whether OFAC's challenged action is narrowly tailored to its goal of preventing untraceable illicit financial transactions. Plaintiffs' opposition suggests no alternative designation that would have been more narrowly tailored and could have achieved OFAC's goal in this context—and even if they could suggest an alternative, OFAC need not show that its action is the least restrictive means of achieving its goal here. *See Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 478 (1989). Instead, Plaintiffs fault Defendants for not "explain[ing] why that same argument would not allow it to sanction any bank that inadvertently facilitates money laundering on a handful of occasions." Pls.' Opp'n at 19. The explanation is obvious: if a bank were to structure its operations in a way that insulated itself (and its customers) from regulatory oversight and accountability, such that the Government would be unable to detect illicit transactions, the Government might very well sanction that bank without having identified more than a "handful" of the purposely obscured transactions. And it is unsurprising that the Government might *publicly* identify only a few such transactions when the designated entity is—like Tornado Cash—*designed* to obfuscate the identities of its customers.

Sanctioning an entity for facilitating the illicit conduct of its customers, which the president has declared a serious threat to U.S. national security and foreign policy, is appropriately tailored to the critical goal of countering that threat. OFAC's designation thus easily satisfies the narrow-tailoring requirement of intermediate scrutiny. *Cf. Emergency Coal. to Defend Educ. Travel v. U.S. Dep't of the Treasury*, 545 F.3d 4, 13 (D.C. Cir. 2008) (upholding OFAC's regulations governing the Cuba trade embargo and rejecting plaintiffs' First Amendment argument, even assuming incidental restriction on First Amendment rights, because regulations' goal of "deny[ing] currency to the government of Cuba" was "vital" and not "remotely related to the suppression of free expression").

Finally, Plaintiffs argue summarily that the designation of this single entity is overbroad because the "ability to transact without fear of public exposure is an interest held dear" globally and Tornado Cash "ensures greater anonymity." Pls.' Opp'n at 19. They dismiss as irrelevant the availability of countless other means of donating money "without public exposure," *id.*, but those other means show that this highly targeted designation well clears the hurdle of "strik[ing] a balance between competing social costs," particularly where the designation is "directed at conduct" that is harmful to national security, *United States v. Williams*, 553 U.S. 285, 292 (2008). Plaintiffs' conclusory statement that the designation "risks prohibiting a substantial amount of protected speech," Pls.' Opp'n at 19, falls far short of their high burden of "demonstrat[ing] a realistic danger that the [regulation] itself will significantly compromise recognized First Amendment protections." *Hersh v. U.S. ex rel. Mukasey*, 553 F.3d 743, 762 (5th Cir. 2008) (citation omitted); *see also L.A. Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 40 (1999) (the overbreadth doctrine is a "last resort," and its limited function is further diminished as the regulated expression "moves from 'pure speech' toward conduct"). Accordingly, even if Plaintiffs had identified any First Amendment–protected interest implicated by the designation of Tornado Cash, that designation is not overbroad in achieving Defendants' legitimate goal of preventing malicious cyber activities to safeguard national security.

//

//

//

//

//

//

//

**CONCLUSION**

For these reasons, the Court should grant Defendants' Cross-Motion for Summary Judgment

and deny Plaintiffs' Partial Motion for Summary Judgment.

Dated: June 14, 2023                                  Respectfully Submitted,

                                                      BRIAN M. BOYNTON
                                                      Principal Deputy Assistant Attorney General

                                                      ALEXANDER K. HAAS
                                                      Director

                                                      DIANE KELLEHER
                                                      Assistant Director

                                                      */s/ Stephen M. Elliott*
                                                      STEPHEN M. ELLIOTT (PA Bar #203986)
                                                      Senior Trial Counsel
                                                      CHRISTINE L. COOGLE
                                                      Trial Attorney
                                                      Federal Programs Branch, Civil Division
                                                      U.S. Department of Justice
                                                      1100 L St. NW
                                                      Washington, D.C. 20005
                                                      Tel: (202) 353-0889
                                                      E-mail: stephen.m.elliott@usdoj.gov

                                                      *Counsel for Defendants*